IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ERIC MANDELL,

                Plaintiff,

      v.                            Civil Action No.
                                     9:06-CV-01478 (GTS/DEP)

GLENN S. GOORD, Commissioner,
Department of Correctional Services
*et al.,*

                Defendants.

_____

APPEARANCES:           OF COUNSEL:

FOR PLAINTIFF:

ERIC MANDELL, *Pro Se*
80 E. 110th Street, Apt. 3A
New York, NY 10029

FOR DEFENDANTS:

ANDREW M. CUOMO          TIMOTHY P. MULVEY, ESQ.
Attorney General of the State    Assistant Attorney General
  of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

    Plaintiff Eric Mandell, a former New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights arising out of his incarceration, additionally asserting pendent state law claims for assault and battery.[1]  In his complaint the plaintiff asserts that he was denied due process during the course of a hearing to address disciplinary charges against him, and that the defendants retaliated against him for appealing the resulting disciplinary determination by brutally beating him, denying him medical treatment, and threatening that if he reported the assault he would be beaten again, even more severely.  As relief, the plaintiff seeks a declaratory judgment that his constitutional rights were violated, an injunction prohibiting the defendants from further retaliating against him, and compensatory and punitive damages.

Currently pending before the court is the defendants' motion for summary judgment dismissing the claims against them.  In their motion the defendants argue that 1) the plaintiff's amended complaint is subject to dismissal in its entirety based upon his failure to exhaust all of his administrative remedies before filing suit; 2) plaintiff's claims against the defendants Glenn S. Goord, the Commissioner of the New York State

---

[1]     From a change of address form submitted by the plaintiff, it appears that he was released from prison on or about May 28, 2008.  Dkt. No. 36.

Department of Correctional Services ("DOCS"), William Lape, the superintendent of the facility at which the relevant conduct occurred, and Mr. Whitmore, a lieutenant at the facility, should be dismissed for lack of their personal involvement in the offending conduct; and 3) the claim for violation of his right to procedural due process during the disciplinary proceeding should be dismissed on the merits, since the plaintiff was not deprived of a cognizable liberty interest, and in any event he was afforded the constitutionally mandated minimal due process.  For the reasons set forth below, I recommend that the defendants' motion be granted in part, and that the plaintiff's claims against Goord and Lape as well as his due process cause of action be dismissed, but that the defendants' motion otherwise be denied based upon the existence of triable issues of fact as to whether administrative remedies were available to the plaintiff, and/or whether the defendants should be estopped from raising an exhaustion defense, as well as surrounding defendant Whitmore's involvement in the violations alleged.

I.      BACKGROUND[2]

_____

        [2]      In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted that for purposes of this motion the defendants have not

Prior to his release, the plaintiff was a prison inmate entrusted to the care and custody of the DOCS; at the time of the incidents giving rise to the plaintiff's complaint, Mandell was designated to the Marcy Correctional Facility ("Marcy), located in Marcy, New York.  Amended Complaint (Dkt. No. 15) ¶ 3.

The circumstances giving rise to the plaintiff's claims were set in motion when, on May 19, 2006, he was required to submit to a urine test and thereafter, based upon a positive test result, was served with a misbehavior report charging him with drug use in violation of prison rules. *Id.* ¶¶ 11-12.  A disciplinary hearing was subsequently conducted over a period of several days, beginning on June 1, 2006, with Corrections Captain Brown acting as the hearing officer.  *Id*. ¶ 13 and Exh. 1.  During the hearing Mandell denied the charge, alleging that the urine test upon which it was predicated was unreliable and resulted in a false positive.[3] *Id*. ¶ 13.  On June 6, 2006, following the disciplinary hearing, Mandell was found guilty of violating prison rules prohibiting drug use and was sentenced to ninety days of disciplinary confinement in a special housing

contested the majority of the plaintiff's substantive allegations.

[3]     The plaintiff also alleges that he was "set-up for a dirty urine test" by prison officials.  Amended Complaint (Dkt. No. 15) ¶ 9.

unit ("SHU") with a corresponding loss of package, commissary and telephone privileges and a recommended loss of three months of good time credit.[4]  Amended Complaint (Dkt. No. 15) ¶ 14.  At the time of the decision Mandell was informed that the papers necessary for appealing that determination would be mailed to him.  *Id.*

While in the SHU, because he had not received the appeal papers, on June 11, 2006 the plaintiff asked the officer on duty, defendant Dzwonkas, if appeal forms were available in SHU, and was told that they were not.  *Id.* ¶16.  Mandell then asked if he could see a sergeant about securing the necessary papers.  *Id.*  Dzwonkas disappeared, returning several hours later with two other officers, defendants Hall and Anna. *Id.* ¶ 17.  Apparently agitated because Mandell had requested appeal papers, the officers directed the plaintiff to face and place his hands on the wall, spread eagle, entered the plaintiff's cell and began yelling obscenities, and beat him, breaking his leg in two locations and causing several other bruises and abrasions.  *Id.* ¶¶ 18-21.  The plaintiff did not resist or threaten the officers during the attack, but instead attempted to convince them that

---

[4]      Special housing units are cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

he had not meant any disrespect by asking to see a sergeant regarding his appeal. *Id.* ¶¶ 19, 22.   As the officers were leaving his cell the plaintiff could hear them laughing, calling him a baby, and threatening that if he reported the incident they would break his neck the next time. *Id.* ¶ 24.

After having been left for several hours on the floor of his cell, in pain, the plaintiff was finally able to convince prison officials to provide him with medical attention for his injuries.  Amended Complaint (Dkt. No. 15) ¶¶ 24-26.  As he was leaving the SHU for that purpose, the plaintiff was told by defendant Whitmore that he did not care what story Mandell told but warned that it would be in his best interest not to tell anyone at the clinic that the defendants were responsible for his injuries. *Id.* ¶ 28. Fearing retribution the plaintiff acquiesced, and at the clinic he reported to the examining nurse that he had twisted his ankle while trying to use the bathroom. *Id.* ¶ 29.  While the nurse examined the plaintiff, she informed him that there was nothing wrong with his leg and did not order X-rays; she sent him back to the SHU with some ibuprofen and an ankle brace. *Id.* ¶ 29.

The following day Mandell was unable to get out of his bed, and as a result was taken to emergency sick call.  Amended Complaint (Dkt. No.

15) ¶ 30.  At the entrance to the SHU the plaintiff was again confronted by a corrections officer, this time defendant Hawes, who warned him to adhere to his story if he wanted the rest of his stay at Marcy to be "pleasant." *Id.* ¶ 31.

The plaintiff was eventually seen by a facility doctor and x-rayed, and on June 20, 2006 he was informed that he had sustained a broken ankle and fibula.  Amended Complaint (Dkt. No. 15) ¶ 33.  Mandell underwent corrective surgery on June 29, 2006 at an outside medical center, and thereafter was returned to Marcy.  *Id.* ¶ 34.

The disciplinary decision finding the plaintiff guilty of drug use was ultimately overturned on appeal by Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, on August 7, 2006, and the charges were ordered expunged from Mandell's records.  Amended Complaint (Dkt. No. 15) ¶ 35 and Exh. 1.  Based upon that determination, the plaintiff was released from SHU confinement, and on August 14, 2006 was transferred into the hospital unit at the nearby Oneida Correctional Facility ("Oneida").  *Id.* at ¶ 36.

The plaintiff maintained his false rendition of the June 11, 2006 incident until his transfer into Oneida; once there, however, he accurately

recounted to a nurse the events that led to his broken leg.   Amended

Complaint (Dkt. No. 15) ¶ 37.  The nurse, in turn, reported the incident to

a sergeant, who contacted the internal investigation unit of the DOCS.  *Id.*

Sometime in September of 2006, a representative from the DOCS internal

investigation unit interviewed the plaintiff, who reported the attack and

informed the investigator about the threats, adding that because he feared

for his life and safety he had not previously told anyone what actually

occurred.  *Id.* ¶ 39.

       The plaintiff filed a grievance on September 12, 2006 with defendant

William Lape, the superintendent at Marcy, as well as with the Inmate

Grievance Program ("IGP") at Oneida, complaining of the June 11, 2006

beating, the failure of prison officials to provide medical care, and the

threats made against him.  Amended Complaint (Dkt. No. 15) ¶ 38 and

Exh. 2.  That grievance detailed the beating, and also explained that in

light of threats of further beatings the plaintiff never informed anyone what

had really happened until his transfer into Oneida.  Amended Complaint

(Dkt. No. 15) Exh. 2.  Mandell's grievance was denied as untimely on

September 18, 2006, and all documents associated with the matter were

returned to him.  Amended Complaint (Dkt. No. 15) ¶ 40 and Exh. 3.

The following day, the plaintiff wrote a letter attempting to appeal the denial of his grievance to the defendants Goord and Lape, as well as to the superintendent at Oneida.  Amended Complaint (Dkt. No. 15) Exh.  4.  In response, he received a letter from the office of then-acting Commissioner of the DOCS, Lucien J. Leclaire, Jr., encouraging Mandell to follow procedures outlined in the DOCS regulations regarding the established grievance process, and advising, among other things, that he should provide the facility IGP supervisor with mitigating circumstances justifying his failure to timely file the grievance.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 43-11) ¶ 6-7; [5] *see also* Amended Complaint (Dkt. No. 15) Exh. 5.  Instead, without following that directive, the plaintiff commenced this action.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 43-11) ¶ 8.

II.   <u>PROCEDURAL HISTORY</u>

The plaintiff commenced this action on December 11, 2006, and was thereafter granted leave to proceed *in forma pauperis*.  Dkt. Nos. 1, 4.  Having originally named the corrections officers involved as "John Doe"

---

[5]     As will be seen, by his failure to oppose the defendants' motion the plaintiff is deemed to have admitted the factual assertions contained within Defendants' Local Rule 7.1(a)(3) Statement.  *See* pp. 13-15, *post*.

defendants, the plaintiff was subsequently permitted to amend his
complaint on June 4, 2007 to name the defendants, who are now
identified as Lieutenant Whitmore, Sergeant R. Hawes, Corrections
Officers Dzwonkas, Hall and Anna, Commissioner Goord, and Marcy
Superintendent Lape, all of whom are sued in their individual and official
capacities.  Dkt. No. 14.  The plaintiff's amended complaint alleges
violations of the First, Eighth, and Fourteenth Amendments to the United
States Constitution, as well as pendent state law claims for assault and
battery, asserting that he was 1) subjected to excessive use of force; 2)
denied medical treatment for the serious injuries sustained as result
thereof; 3) denied due process in the disciplinary proceedings; and 4)
retaliated against for pursuing an appeal of his grievance; and further that
5) the defendants conspired to retaliate against him and cover up their
unconstitutional conduct.   Dkt. No. 15.

Following joinder of issue and the close of discovery, on November
12, 2008 the defendants filed the pending motion for summary judgment
seeking dismissal of the plaintiff's amended complaint.  Dkt. No. 43.
Despite the fact that the deadline for the plaintiff's submission of papers in
opposition to the defendants' motion has long since passed, the plaintiff

has filed no responsive papers.  The defendants' motion, which is now

ripe for determination, has been referred to me a report and

recommendation to the assigned district judge pursuant to 28 U.S.C. §

636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c).

III.   DISCUSSION

    A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, the entry of summary

judgment is warranted when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material," for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Plaintiff's Failure to Respond to the Motion

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any

> papers as required by this Rule shall be deemed as
> consent to the granting or denial of the motion, as the
> case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to special

latitude when defending against summary judgment motions.  *See*

*Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997)

(McAvoy, C.J.)).  Despite this measure of deference, the failure of an

unrepresented plaintiff to oppose a summary judgment motion does not

preclude the court from deciding the motion.  *Robinson v. Delgado*, No.

96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. &

Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1

(N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980

F. Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  As can

be seen by the face of Local Rule 7.1(b)(3), however, before summary

judgment can be granted under such circumstances the court must review

the motion to determine whether it is facially meritorious.  *See Allen v.*

*Comprehensive Analytical Group, Inc*., 140 F. Supp. 2d 229, 231-32

(N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542,

545-46 (N.D.N.Y. 2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion

does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences.  By electing not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged.  Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[6]  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

The defendants' Local Rule 7.1(a)(3) statement consists only of eight separately numbered paragraphs, the majority of which relate to facts relevant to the defense of exhaustion.[7]  *See generally* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 43-11).  Based upon the record

---

[6]    According to Local Rule 7.1(a)(3),  "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original).

[7]    Paragraphs 3 and 4 of the defendants' Local Rule 7.1(a)(3) statement merely paraphrase the plaintiffs's allegations regarding the alleged beating and threats.  *See* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 43-11) ¶¶ 3-4.

before the court these facts do not appear to be disputed by the plaintiff.

In any event, I recommend that in accordance with well established

practice, and notwithstanding the plaintiff's *pro se* status, the court accept

the defendants' assertions of fact as set forth in their Local Rule 7.1(a)(3)

Statement as uncontroverted, in light of the plaintiff's failure to respond to

that statement, when reviewing the defendants' motion for facial

sufficiency.

      C.    <u>Failure to Exhaust Administrative Remedies</u>

      On September 12, 2006, approximately one month after his transfer

out of Marcy, the plaintiff filed a grievance complaining of the June 11,

2006 incident, including the use of excessive force, the refusal of prison

officials to provide him with needed medical treatment, and threats of

further beating if he reported the incident.  Amended Complaint (Dkt. No.

15) Exh. 2.  Prior to his transfer, the plaintiff did not suggest to anyone

that he was injured at the hands of the defendants Dzwonkas, Anna and

Hall, or that he was threatened by those corrections officers as well as

Whitmore, and did not file any complaint or grievance regarding the

matter.  *See id.* ¶¶ 29, 32, 34, 37.  The plaintiff's September, 2006,

grievance was rejected as untimely under the governing provisions of the

DOCS regulations establishing the internal grievance process, Amended

Complaint (Dkt. No. 15) Exh. 3, and his subsequent attempts to appeal

that ruling were rebuffed.  *Id.* Exh. 5.  In their motion, the defendants

contend that the plaintiff's complaint must be dismissed in its entirety as a

result of his failure to exhaust administrate remedies.

    1.    <u>Exhaustion Generally</u>

    With an eye toward "reduc[ing] the quantity and improv[ing] the

quality of prisoner suits[,]"  *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct.

983, 988 (2002), Congress altered the inmate litigation landscape

considerably through the enactment of the Prison Litigation Reform Act of

1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing

several restrictions on the ability of prisoners to maintain federal civil rights

actions.  An integral feature of the PLRA is a revitalized exhaustion of

remedies provision which requires that "[n]o action shall be brought with

respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct.

2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003,

at *5-6 (E.D.N.Y. Jan. 31, 2007).  This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record."  *Jones v. Bock,* 549 U.S. 199, 204, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122 S. Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 549 U.S. at 212*,* 127 S. Ct. at 919.  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-

0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.);

*see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that

the PLRA requires "proper exhaustion" of available remedies).  "Proper

exhaustion" requires a plaintiff to procedurally exhaust his or her claims by

"compl[ying] with the system's critical procedural rules."  *Woodford*, 548

U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 44

(2d Cir. 2007) (citing *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388 ).

While placing prison officials on notice of a grievance through less formal

channels may constitute claim exhaustion "in a substantive sense", an

inmate plaintiff nonetheless must meet the procedural requirement of

exhausting his or her available administrative remedies within the

appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495

F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis omitted).

 In a series of decisions rendered since the enactment of the PLRA, the

Second Circuit has crafted a three-part test for determining whether

dismissal of an inmate plaintiff's complaint is warranted for failure to

satisfy the PLRA's exhaustion requirement.[8]  *Macias*, 495 F.3d at 41; *see*

---

[8]     As will be seen, whether the *Hemphill* test survives following the
Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See,
e.g.*, *Newman v. Duncan*, No. 04-CV-395, 2007 WL 2847304, at *2 n.4 (N.D.N.Y. Sept.
26, 2007) (McAvoy, S.J. and Homer, M.J.).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the

prescribed algorithm, a court must first determine whether administrative

remedies were available to the plaintiff at the relevant times.  *Macias*, 495

F.3d at 413; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was

available, the court must next examine whether the defendants have

forfeited the affirmative defense of non-exhaustion by failing to properly

raise or preserve it or whether, through their own actions, by preventing

the exhaustion of the plaintiff's remedies, they should be estopped from

asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41;

*Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives

these first two levels of scrutiny, the court lastly must examine whether

special circumstances nonetheless exist and "have been plausibly

alleged" to justify the plaintiff's failure to comply with the applicable

administrative procedural requirements.[9]  *Macias*,495 F.3d 41; *Hemphill*,

380 F.3d at 686.

    a)    <u>Availability of Remedy</u>

With regard to the first level of scrutiny, New York prison inmates

---

[9]    These three prongs of the prescribed test, though distinct, plainly admit of significant overlap.  *See Hargrove v. Riley*, No. CV-04-4587, 2007 WL 389003, at *8 n.14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v. Goord,* 380 F.3d 670, 677 n.6 (2d Cir. 2004).

are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*,

No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite an inmate's entitlement in most instances to file and pursue a

grievance in accordance with the IGP, there are circumstances under

which the grievance procedure nonetheless is deemed not to have been

available to an inmate plaintiff.  *See Hemphill*, 380 F.3d at 687-88.  Thus,

for example, "[e]xhaustion may be considered unavailable in situations

where plaintiff is unaware of the grievance procedures or did not

understand it, . . . or where defendants' behavior prevents plaintiff from

seeking administrative remedies."  *Hargrove,* 2007 WL 389003, at *8

(citations omitted) (noting, for example, that a defendant's failure to

advance plaintiff's grievances or the issuance of threats against an inmate

to deter the filing of a grievance may effectively render the administrative

process unavailable).  When testing the availability of administrative

remedies in the face of claims that undue influence from prison workers

has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated

individual of ordinary firmness [would] have deemed them available."  *Id.*

at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003,

at *8.  In *Hemphill*, the Court noted that "threats or other intimidation by

prison officials may well deter a prisoner of ordinary firmness from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *Lunney v. Brureton*, No. 04 Civ. 2438, 2007 WL 1544629, at *9 (S.D.N.Y. May 29, 2007) (quoting *Hemphill*, 380 F.3d at 688) (internal quotations omitted).

### b)    Presentation of Defense/Estoppel

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."  *Hemphill,* 380 F.3d at 686 (citations omitted).

### c)    Special Circumstances

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,*

2007 WL 389003, at *10.  Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable.  *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).

    2.   <u>Plaintiff's Failure to Exhaust</u>

By his own admission, the plaintiff took no steps to seek internal, administrative review of his complaints until his transfer into Oneida, some ninety-three days after the alleged incident.  Since, as was previously noted, the deadline for filing a grievance is within twenty-one calendar days from the alleged occurrence, 7 N.Y.C.R.R. § 701.5(a), the grievance was patently untimely and thus properly rejected as such.[10]

Applying the "ordinary fitness" standard, however, and viewing the evidence in the light most favorable to the plaintiff, a reasonable factfinder could conclude that an inmate in the plaintiff's position would have been

---

[10]    Under the IGP prisoners may request and the IGP supervisor may grant an exception to the twenty-one day filing period if "mitigating circumstances" prevented him from taking action in a timely manner. 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b). However, "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence." *Id.* § 701.6(g)(1)(i)(*a*).

deterred from complaining of the assault and ensuing refusal to provide medical treatment.   According to the plaintiff, the beating that he received was so severe that he required surgery to repair the multiple fractures of his leg.  The beating was followed by an immediate threat that if he reported the incident he would be subjected to further assaults.  The plaintiff was then allegedly refused medical treatment, despite severe pain, and when he was finally taken to the facility clinic, he was again warned by the corrections officers not to reveal the circumstances surrounding his injuries, a warning which, out of fear, the plaintiff heeded.  In addition, the plaintiff apparently believed that the initial assault was in retaliation for his request for papers necessary to appeal the disciplinary determination which, the plaintiff claims, was based upon a false urine test result.

The fact that Mandell waited until he was transferred into Oneida to file a grievance, as well as the contents of the grievance itself, corroborate that the plaintiff feared he would be subjected to retribution if he complained while at Marcy.  Mandell's grievance expressly explains that "[b]ecause of these threats, I never really told anyone what happen [sic] to me while in SHU at Marcy.  However, when I was transferred from Marcy

to Oneida, I filed a complaint with the medical staff and was later seen by the I.G."  Amended Complaint (Dkt. No. 15) Exh. 2.

In their motion, the defendants do not directly contest the factual allegations underpinning the plaintiff's claims.  Instead, they rely solely on the plaintiff's failure to timely exhaust administrative remedies, without addressing the issue of availability, arguing that Mandell's failure to follow the appropriate procedures and to request an extension of time to file a grievance preclude this action.  Notably, the defendants ignore the facts that even though the plaintiff's grievance provided an explanation for his delay, that grievance was tersely rejected as untimely, and the defendants did not advise the plaintiff at that time that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed.  It was not until the letter of October 6, 2006 from the Commissioner's office, responding to the plaintiff's attempted appeal of the denial of his grievance as untimely, that the plaintiff was instructed to file for an exception under section 701.6(g); by that time, one hundred and seventeen days had passed since the alleged occurrence, and the time limit for seeking extensions – forty-five days from the alleged

occurrence – had long since expired.

The record now before the court reflects that the plaintiff's official outlets for reporting misconduct were foreclosed by the time he moved to the apparent safety of Oneida.  Material questions of fact, however, remain as to whether administrative remedies were available for the plaintiff to exhaust prior to his transfer into Oneida.  Moreover, viewing the facts in a light most favorable to the plaintiff, it is conceivable that he believed that by "appealing" the rejection of his grievance as untimely to the Commissioner and the facility superintendent he had followed the correct procedures outlined in section 701.5(c) for appealing the denial of a grievance.  While the defendants have satisfied the second prong of the *Hemphill* test by preserving the defense of non-exhaustion in their answer to the plaintiff's amended complaint, it is arguable that questions of fact also exist as to whether the defendants should be estopped by their own conduct, including alleged threats and their handling of the grievance once it was filed, from relying on this defense.

In sum, when drawing all inferences and resolving all ambiguities in the plaintiff's favor, as I must, I find material questions of fact exist on the issues of whether administrative remedies were available to the plaintiff

and whether the defendants should be estopped from relying on the non-exhaustion defense. *Lunney*, 2007 WL 1544629, at *9 (citing cases). I therefore recommend that the defendants' motion for summary judgment dismissing the amended complaint for failure to exhaust administrative remedies be denied.

> D.   Personal Involvement of Defendants Whitmore, Goord and Lape

In their motion, the defendants seek dismissal of the plaintiff's claims against Commissioner Goord, Superintendent Lape and Lieutenant Whitmore, arguing that those defendants were not personally involved in the alleged constitutional violations and therefore cannot be held responsible under section 1983.

A fundamental, bedrock requirement for establishing liability of a defendant under section 1983 is that the party was personally involved in some way in the alleged deprivation of constitutional rights. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 920 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must therefore show some tangible connection between the constitutional violation alleged and that

particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

### 1.    Defendant Whitmore

Contrary to the defendants' argument, the plaintiff's amended complaint makes factual allegations based upon which a reasonable factfinder could conclude that defendant Whitmore was personally involved in the alleged deprivation of the plaintiff's rights.  The plaintiff's amended complaint alleges, and the defendants do not challenge this in their motion, that Whitmore was one of the officers who threatened the plaintiff after the June 11, 2006 incident and contributed to the plaintiff's delay in the filing of a grievance.  Amended Complaint (Dkt. No. 15) ¶¶ 27-28.  If the allegations in the amended complaint are proven at trial, a reasonable jury could find that Whitmore was personally involved, and thus liable for, deliberate indifference to the plaintiff's serious medical need and perhaps retaliation.[11]  As a result, I find that questions of fact

_____

[11]    Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994); *Leach v. Dufrain*, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (*citing Farmer*, 511 U.S. at 837, 114 S. Ct. at 1970); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.) (*citing Farmer*, 511 U.S. at 837, 114 S. Ct. at 1970).

remain as to Whitmore's involvement in the conduct forming the basis for the plaintiff's constitutional claims, thereby precluding the entry of summary judgment dismissing the plaintiff's claims against him.

### 2.   Defendant Goord

The plaintiff asserts that defendant Goord should be held liable for his injuries because of his "failure to adequately train" the officers who allegedly assaulted the plaintiff (Amended Complaint [Dkt. No. 15] ¶ A(3)), and his failure to "take disciplinary or other action to curb the known pattern of physical abuse" (Amended Complaint [Dkt. No. 15] ¶ 43).  It is thus readily apparent that Mandell's claims against Goord are premised solely upon his position as Commissioner of the DOCS.  It is well established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Mere vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to bridge the gap and establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To

the extent that [a] complaint attempts to assert a failure-to-supervise claim

. . . [that claim is insufficient where] it lacks any hint that [the supervisor]

acted with deliberate indifference to the possibility that his subordinates

would violate [plaintiff's] constitutional rights.").

While *respondeat superior* will not suffice to establish liability,

culpability on the part of a supervisory official for a civil rights violation can

be established in one of several ways, including when that individual 1)

has directly participated in the challenged conduct; 2) after learning of the

violation through a report or appeal, has failed to remedy the wrong; 3)

created or allowed to continue a policy or custom under which

unconstitutional practices occurred; 4) was grossly negligent in managing

the subordinates who caused the unlawful event; or 5) failed to act on

information indicating that unconstitutional acts were occurring.  *Iqbal v.*

*Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds, sub.*

*nom. Iqbal v. Hasty*, ___ U.S. ___, 128 S.Ct. 2931 (2009); *see also*

*Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*,

781 F.2d 319, 323-24 (2d Cir. 1986).

The plaintiff wrote a letter to Commissioner Goord after the

dismissal of his grievance, in an effort to appeal the ruling that his

31

grievance was untimely; by letter from Assistant Commissioner Edward J.

McSweeney, the office of the then-commissioner – who is not a named

defendant – declined to consider the plaintiff's purported appeal.

Amended Complaint (Dkt. No. 15) ¶ 40.  Again, these allegations alone

are insufficient for a finding of liability against defendant Goord.  A

supervisor's failure to respond to a letter or grievance from a prisoner

alone provides no basis to impute personal liability to that supervisor.

*Lyerly v. Phillips*, No. 04-CV-3904, 2005 WL 1802972, at *7 (S.D.N.Y.

2005) (Castel, J.) (*citing Johnson v. Wright*, 234 F. Supp. 2d 352, 363

(S.D.N.Y. 2002).  Additionally, supervisors are permitted to delegate

responsibility for handing grievances to subordinates and may properly

rely on the determinations that those subordinates make; such reliance,

standing alone, is similarly insufficient to show that the supervisor failed to

remedy the alleged misconduct. *Burns v. Trombly*, No. 05-CV-1204, 2008

WL 2003804, at *13 (N.D.N.Y. May 7, 2008) (Sharpe, J.) (*citing Shabazz

v. Lee*, No. 03-CV-1520, 2007 WL 119429, at *7 n.4 (N.D.N.Y. Jan. 10,

2007) (Homer, M.J.)). Simply stated, the mere receipt of a grievance

appeal does not suffice to place a supervisor on notice that a

constitutional violation has actually occurred. *See Burns*, 2008 WL

2003804 at *15.

Commissioner Goord's only potential connection to this matter is the plaintiff's grievance filed in September of 2006.  There is no indication in the record that the alleged constitutional violations were brought to the Commissioner's attention prior to the attempted appeal.  Moreover, there are no other allegations in the amended complaint, or facts in the record, that would support the plaintiff's conclusory allegations that Goord was negligent in managing his subordinates.  Accordingly, because the plaintiff's claims against Goord are predicated upon nothing more than a theory of *respondeat superior*, no reasonable factfinder could conclude he was personally involved in the alleged unconstitutional conduct, and I therefore recommend that the defendants' motion for summary judgment dismissing the plaintiff's claims against defendant Goord be granted. *See Richardson*, 347 F.3d at 435.

> 3.   Defendant Lape

The plaintiff's claims against defendant Lape are equally conclusory and also appear to turn solely upon his supervisory role.  The plaintiff alleges that defendant Lape failed to take disciplinary action to curb the known pattern of physical abuse by the defendants Dzwonkas, Hall and

Anna, neglected to take corrective action to remedy the alleged denial of

due process during the plaintiff's disciplinary proceeding, and did nothing

to overturn the disciplinary conviction despite his knowledge of

constitutional violations.  Amended Complaint (Dkt. No. 15) ¶¶ 43-45,

A(2).  There are no facts in the record suggesting that the defendants

Dzwonkas, Hall and Anna had a history of assaulting inmates that was

made known to Lape prior to the June 11, 2006 assault.  Similarly, there is

no evidence that Lape was made aware of any constitutional defects in

the plaintiff's disciplinary proceeding but failed to correct them.[12] Since the

plaintiff has offered no facts beyond Lape's capacity as supervisor of the

officers who allegedly beat him, and there is no proof in the record that

Lape was personally involved in any of the allegedly unconstitutional

conduct, no reasonable factfinder could discern a basis to hold Lape

liable. *See Richardson*, 347 F.3d at 435.   Accordingly, I recommend that

the defendants' motion be granted and that the plaintiff's claims against

--------

[12]     The disciplinary hearing, which resulted in the plaintiff's confinement in the Marcy SHU, was conducted by Captain Brown, who is not a defendant in this case. Amended Complaint (Dkt. No. 15) Exh. 1.  The decision was reviewed on appeal, and the order reversing it was signed, by Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program, who likewise is not a defendant in this case. *Id.* As such, the plaintiff's allegations and the evidence produced appear to contradict his claims of personal involvement on the part of defendant Lape in the course of the disciplinary proceedings.

defendant Lape also be dismissed.

      E.    <u>Procedural Due Process Violation</u>

Although somewhat unclear, it appears that the plaintiff also seeks redress for alleged violations of his Fourteenth Amendment right to due process of law during the disciplinary proceeding that resulted in his confinement in SHU.  Amended Complaint (Dkt. No. 15) pp. 16-17. Following a hearing conducted over the period beginning on June 1, 2006, a hearing officer concluded that the plaintiff had violated prison rules prohibiting drug use, and imposed a penalty which included ninety days in SHU disciplinary confinement.  While the decision was reversed on appeal, the plaintiff served sixty-nine days of the ninety-day sentence prior to the reversal.  In their motion, the defendants contend that a period of sixty-nine days in SHU confinement is insufficient to implicate a protected liberty interest, and that in any event Mandell was provided all of the process that was due, and that his claim should therefore be dismissed.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural

safeguards.  *See Tellier v. Fields*, 260 F.3d 69, 79-80 (2d Cir. 2000)

(citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d

349, 351-52 (2d Cir. 1996).

1.   Atypical and Significant Hardship

"[T]he Constitution [does] not require that restrictive confinement

within a prison be preceded by procedural due process protections unless

the confinement subjected the prisoner to 'atypical and significant

hardship on the inmate in relation to the ordinary incidents of prison life.'"

*Colon v. Howard*, 215 F.3d 227, 229 (2d Cir. 2000) (quoting *Sandin v.*

*Conner*, 515 U.S. 472, 484 (1995)).  "[A] prisoner asserting that he was

denied due process in connection with segregated confinement or a loss

of privileges must make a threshold showing that the deprivation of which

he complains imposed . . . an 'atypical and significant hardship.'"

*H'Shaka v. Drown*, No. 9:03-CV-937, 2007 WL 1017275, at * 9 (N.D.N.Y.

March 30, 2007) (Kahn, J. and Treece, M.J.) (quoting *Sandin*, 515 U.S. at

484).  In determining atypicality, courts look at both the duration and the

conditions of the confinement. *Colon*, 215 F.3d at 231 (quoting *Sealey v.*

*Giltner*, 197 F.3d 578, 585 (2d Cir. 1999)).  "Factors relevant to

determining whether the plaintiff endured an 'atypical and significant

hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).

The Second Circuit has "emphasized that the duration of SHU confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon*, 215 F.3d at 231 (citing *Sealey*, 197 F.3d at 586).  In that regard, in *Sealey* the court held that a period of confinement in SHU for one 101 days, alone, was not "atypical" for the purposes of this analysis.[13] *Sealey*, 197 F.3d at 589-90.  At the same time, however, it has "also stated that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. . . ." *Davis v. Barrett*, 2009 WL 2411811, at *3, ___ F.3d ___ (2d Cir. Aug. 7, 2009) (quoting *Palmer*, 364

––––––––––––––––––––

[13]     District courts within this circuit have held that periods even longer than 101 days do not rise to the level of atypical and significant hardships. *See, e.g., Spence v. Senkowski*, No. 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (holding that a 180-day SHU sentence, served under more confining circumstances than those of the general prison population, did not infringe upon a liberty interest); *Warren v. Irvin*, 985 F. Supp. 350 353-56 (W.D.N.Y. 1997) (161 days); *Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y. 1996) (180 days); *Nogueras v. Coughlin*, No. 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days).

F.3d at 65) (internal quotations omitted).  The question of what could be

considered as "normal" SHU conditions was illuminated in *Colon* when the

court concluded that such ordinary SHU conditions existed where the

inmate plaintiff was

> placed in a solitary confinement cell, kept in his cell
> for 23 hours a day, permitted to exercise in the
> prison yard for one hour a day (JA 107), limited to
> two showers a week, and denied various privileges
> available to general population prisoners, such as
> the opportunity to work and obtain out-of-cell
> schooling. Visitors were permitted, but the
> frequency and duration was less than in general
> population. The number of books allowed in the
> cell was also limited.

*Colon*, 215 F.3d at 230.

Here, the plaintiff was confined to SHU for sixty-nine days, a period

of time which, in and of itself, would not indicate atypicality.  The plaintiff's

amended complaint is wholly devoid of any allegations that the conditions

of Mandell's SHU confinement differed in any way from normal SHU

conditions.  In fact, there are no allegations at all regarding his

confinement in SHU, the amended complaint stating only that he was

confined there from June 6, 2006 until August 14, 2006.  Nor is there any

other evidence in the record to suggest that the plaintiff suffered from

conditions that were more severe than the normal SHU conditions.  I

therefore I conclude that the plaintiff has failed to meet his threshold

burden of establishing that he experienced an atypical and significant

hardship implicating a protected liberty interest.[14]

### 2.    Procedural Protections

Even if the plaintiff had sufficiently alleged facts raising an issue as

to whether he experienced a deprivation of a liberty interest sufficient to

trigger the protections of the Fourteenth Amendment, his procedural due

process claim would nonetheless fail.  The procedural protections to

which a prison inmate is entitled when deprived of a constitutionally

cognizable liberty interest are well established, the contours of the

required protections having been articulated in *Wolff v. McDonnell*, 418

U.S. 539, 563-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the

constitutionally mandated due process requirements include 1) written

---

[14]    Recently, the Second Circuit emphasized that "only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law." *Davis*, 2009 WL 2411911, at *4.  The decision in *Davis* is entirely consistent with the Second Circuit's court's prior determination that "[t]he content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." *Sealey*, 197 F.3d at 585.  Accordingly, I do not regard *Davis* as an impediment to deciding the issue of atypicality as a matter of law where, as here, the plaintiff has failed to allege or come forward with any facts that would suggest atypical conditions of SHU confinement.

notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-70, 94 S. Ct. at 2978-83.   In addition, the hearing officer's determination following the hearing must be supported by at least "some evidence."   *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S. Ct. 2768, 2774 (1985).

The plaintiff does not allege that he was denied any of these procedural protections, nor does it appear in this instance that he could. To the contrary, the record shows that the plaintiff received advance notice of the charges against him by way of a misbehavior report.  The plaintiff was offered and accepted assistance at the hearing, as well as information regarding the urinalysis test.  The plaintiff appeared at the hearing, presented witnesses and evidence, and was provided a written statement by the hearing officer explaining the basis for his decision.  In view of these facts, no reasonable juror could find that the plaintiff was

denied his right to due process.[15]  Accordingly, to the extent that the

plaintiff seeks damages for an alleged violation of his right to due process

in connection with his disciplinary proceeding, I recommend that the

defendants' motion be granted and that the claim be dismissed.

IV.   SUMMARY AND RECOMMENDATION

The defendants move for summary judgment dismissing the

plaintiff's amended complaint, asserting his failure to exhaust his

administrative remedies, lack of personal involvement by the defendants

Lape, Goord and Whitmore, and the insufficiency of the plaintiff's due

process claim on the merits.  I recommend that the plaintiff's claims for

excessive use of force, denial of medical treatment, retaliation and

conspiracy be left intact despite his failure to exhaust his administrative

remedies, inasmuch as material questions of fact exist as to whether the

alleged threats against him by corrections officers effectively rendered

those remedies unavailable and/or should estop the defendants from

_____

[15]      Additionally, I note that the plaintiff has failed to name as defendants
either the person responsible for conducting the disciplinary proceeding, Captain
Brown, or the officer issuing the May 24, 2006 misbehavior report, Sergeant Myers.
Because I recommend that the plaintiff's claim be dismissed as substantively
defective, I find that any attempt to amend the complaint to name such defendants
would not cure this fatal defect and would therefore be futile.  *Cuoco v. Moritsugu*, 222
F.3d 99, 112 (2d Cir. 2000).

relying on such defense.

Because the plaintiff's claims against the defendants Goord and Lape are premised solely on their respective supervisory roles, I recommend that the defendants' motion for summary judgment in this regard be granted, and that all claims against those two defendants be dismissed.  With regard to defendant Whitmore, however, I find that the plaintiff has sufficiently alleged his personal involvement, asserting that Whitmore threatened the plaintiff, and as a result, if this allegation can be proven at trial, a reasonable jury could find that Whitmore participated in a violation of the plaintiff's constitutional rights.

Finally, I recommend that the plaintiff's claim for violation of his right to due process with regard to the disciplinary proceeding be dismissed on the grounds that he has failed to make a threshold showing that an actual liberty interest was implicated by his sixty-nine days of confinement in the facility SHU, and further because, even presuming the deprivation of such a liberty interest, the record establishes that the plaintiff was afforded all of the process to which he was constitutionally entitled.  Accordingly, it is hereby respectfully

RECOMMENDED that the defendants' motion for summary

judgment (Dkt. No. 43) be GRANTED, in part, and that the plaintiff's

claims against the defendants Lape and Goord be DISMISSED, and that

the plaintiff's Fourteenth Amendment claims for violation of his due

process rights at his disciplinary hearing also be DISMISSED, but that the

defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within TEN days.  FAILURE TO SO OBJECT

TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), and 72; *Roldan v. Racette,* 984

F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

Report and Recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:        September 1, 2009
              Syracuse, NY

43